**Thomas PORTER, et al., Plaintiffs,**

v.

**Governor Joan FINNEY, et al., Defendants.**

**No. 77–3045–RDR.**

United States District Court, D. Kansas.

June 28, 1994.

Jouett Edgar Arney, pro se.

Roger M. Theis, Wichita, KS, for Jouett Edgar Arney.

William J. Rich, Washburn Law School, Stephen W. Kessler, Topeka, KS, Dwight A. Corrin, Wichita, KS, Lisa Nathanson Moots, Kansas Sentencing Com'n, Topeka, KS, for Thomas H. Porter, Leslie Keith Kimball, Rickey Ray Redford, Robert (NMI) Demass, Richard (NMI) Snell, Dennis (NMI) House, Robert Francis Smith, Jr., Lyle C. Sanders, Donald E. Alexander, Anthony R. Palocioz, Joseph F. Edwards, Randall William Murphy.

Wayne T. Stratton, Goodell, Stratton, Edmonds & Palmer, Carol R. Bonebrake, Office of the Atty. Gen., Charles E. Simmons, Timothy G. Madden, Kansas Dept. of Corrections, Topeka, KS, for Mike Hayden.

John J. Knoll, Office of the Atty. Gen., Timothy G. Madden, Topeka, KS, Joan Finney.

Carol R. Bonebrake, Office of Atty. Gen., Charles E. Simmons, Topeka, KS, for Steven

J. Davies, Raymond (NMI) Roberts, Gary Stotts.

### MEMORANDUM AND ORDER

ROGERS, Senior District Judge.

This case is now before the court upon a dispute between the parties requiring an interpretation of the court-approved "Long–Term Plan for Administrative Segregation Inmates." Before addressing this specific question, the court will provide some factual background.

This prison conditions case was reactivated in 1988 upon plaintiffs' motion to modify and enforce the terms of a consent decree which had been entered in 1980. Following a hearing, the court found violations of the consent decree and the Constitution. On February 15, 1989, the court ordered defendants to develop a plan for improving conditions of confinement for mentally ill, protective custody and other administrative segregation inmates. The court reiterated this order on April 21, 1989 and further directed defendants to develop a short-term and long-term plan to alleviate conditions which violated the consent decree and the Constitution. Specifically, the court directed that plans be implemented which provided mentally ill inmates more out-of-cell time, more appropriate treatment alternatives, and less isolation. The court directed that protective custody inmates have more out-of-cell time and more work, program, and counseling opportunities. The court further directed that a long-term plan meet minimum American Correctional Association standards for housing segregation inmates.

Ultimately, a long-term plan for the incarceration of mentally ill inmates was approved on December 11, 1989. On June 11, 1990, interim and long-term plans regarding the conditions of confinement for protective custody inmates were approved. This order further directed that "[t]he long-term plan for housing protective custody and other administrative segregation inmates at the [new] El Dorado Correctional Facility ['EDCF'] shall be implemented by January 1, 1992."

On December 31, 1992, defendants' "long-term plan regarding administrative segregation inmates" was presented for the court's approval. The court approved the plan, which had been implemented since January 1, 1992 and had received the agreement of plaintiffs' counsel.

After May 1993, when there were major inmate disturbances at two prison institutions in Kansas, a greatly increased number of inmates were housed in administrative segregation at EDCF. There were approximately 216 inmates in administrative segregation at EDCF when the court held a hearing on this matter in April 1994. This is almost one-third of the total inmate population at that institution.

Inmates in administrative segregation for prison security reasons are released from their cells one hour a day, five days a week. When they are out of their cells, with few exceptions, they have no opportunity to interact with other inmates. Each inmate in administrative segregation is reviewed periodically by an administrative segregation review board. Under Kansas regulations, specifically K.A.R. 44–14–311:

(a) The administrative segregation review board shall review the status of each inmate confined in administrative segregation every seven days for the first two months of segregation and at least every 30 days thereafter.

(b) The board may recommend that the inmate be continued in the inmate's present status. This recommendation shall:

(1) be by unanimous vote of the board; and

(2) become the final action in the case for that particular review period, and shall not be forwarded to the facility principal administrator for approval.

(c) The board shall otherwise recommend to the facility administrator in writing one of the following actions.

(1) The board may recommend that the inmate be returned to general population;

(2) The board may recommend that the inmate be transferred to another Kansas facility or to another institution in another state or a federal institution.

(d) The inmate shall be permitted to submit written requests for release to the administrative segregation review board. The review board consists of a person from the security staff, a person from the clinical staff, and a person from classification staff. K.A.R. 44–14–309.

It is important to note what plaintiffs are not contending. Plaintiffs do not contend that the conditions in administrative segregation violate the Constitution or American Correctional Association standards.[1] Plaintiffs also are not contesting how the decision is made to put inmates in administrative segregation or how inmates are granted leave from administrative segregation.

Instead, plaintiffs' argument is that the long-term plan approved by the court requires defendants to exercise discretion to provide individualized treatment of administrative segregation inmates "through the allowance of privileges commensurate with the security status of each inmate, particularly including the use of day-room space immediately adjacent to the cells." (Doc. No. 491, pp. 1–2). According to plaintiffs, the plan "prohibits defendants from treating all inmates in administrative segregation alike, thereby lowering available privileges to a uniform level of the lowest common denominator." (Doc. No. 493, p. 4). For example, plaintiffs assert that defendants are obliged to provide more out-of-cell time to an inmate with a nonviolent history who was put in administrative segregation as an escape risk than is provided to an inmate with an assaultive background. Plaintiffs draw this argument from the following plan language, which is contained in part III, subpart E of the EDCF General Orders No. 10–102:

> Privileges and rights of inmates in administrative segregation shall, to the extent possible, be the same as that of the general population.
>
> 1. Where possible, the inmate shall retain such privileges and property as are commensurate with the particular circumstance or condition for which the inmate was placed in administrative segregation (KAR 44–14–306).

As referenced above, this language is also contained in K.A.R. 44–14–306. The regulation follows the above-excerpted language with this statement: "Administrative segregation shall not be used or considered as punishment."

Defendants contend that they make distinctions in the treatment of inmates in administrative segregation according to whether the inmates have mental health problems and whether they are in protective custody. Defendants assert that no further individualized treatment is required.[2]

In deciding this dispute, we examine the four corners of the long-term plan and construe it as it is written. See *Sinclair Oil Corp. v. Scherer*, 7 F.3d 191, 194 (10th Cir. 1993).

To reiterate, the pertinent provisions of the plan are contained in part III of EDCF General Orders No. 10–102. Part III, labeled "Administrative Segregation," provides in subpart A that "[i]nmates shall be placed

---

1. EDCF houses the large majority of administrative segregation inmates. It is a new prison. Its cells are 80 square feet. There is natural light. Inmates in administrative segregation can shower and shave at least three times a week. They have access to telephones in their cells and reading materials. Commissary, hair care and laundry services are available. They have the same food and mail privileges as inmates in general population. They are permitted noncontact visitation and have access to mental health, chaplaincy, education, and legal services. They may have their personal property. EDCF has been inspected and accredited by the American Correctional Association. It has also received positive evaluations from a panel of mental health professionals that examined mental health services at EDCF.

2. Defendants also argue that in negotiations plaintiffs tried to include a provision for a "reintegration" or "transition" program to assist inmates returning to general population from administrative segregation, but ultimately left this to the discretion of defendants. In fact, defendants are operating a transition program on a small scale. Currently, five inmates are in the program. Inmates in the program have more interaction with other inmates and may have more out-of-cell time. Plaintiffs contend that whether there is a transition program is different from the issue of whether some inmates in administrative segregation should have more out-of-cell time commensurate with their personal background and prison history. We agree.

into administrative segregation in accordance with KAR 44–14–302." K.A.R. 44–14–302 describes the circumstances and conditions for using administrative segregation. It provides that inmates may be confined in administrative segregation: (a) for protective custody; (b) pending the results of an investigation into possible charges; (c) pending a hearing before a disciplinary board or trial in a court; (d) to isolate a communicable disease; (e) to provide special security because of the danger of assault, suicide, self-injury, mental or emotional problems, emergency situations, or escape; (f) because of consistent bad behavior; (g) to protect against "other security risks;" or (h) because the inmate is categorized on holdover status.[3] So, part III of the plan acknowledges in subpart A the different purposes for which inmates may be placed in administrative segregation.

As we read subpart E of the long-term plan, the "particular circumstance or condition for which the inmate was placed in administrative segregation" refers to the purpose for placing an inmate in administrative segregation. The various purposes for placing an inmate in administrative segregation may affect the ability to grant administrative segregation inmates with the same privileges and rights as inmates in general population. The controversy before the court appears to have arisen from the large number of inmates placed in administrative segregation as "other security risks" or "pending investigation." We do not read subpart E as requiring defendants to subclassify "other security risk" inmates housed in administrative segregation and thereafter allow certain inmates more privileges and property because they are considered less of a security risk than other inmates. Nor do we believe the long-term plan requires that individual inmates in administrative segregation "pending investigation" be allowed privileges and property on an individualized basis. The ordinary meaning of the language of subpart E

does not require this. Instead, we believe it means that defendants should permit privileges and property according to the purpose for placing an inmate in administrative segregation, remaining mindful that to the extent possible the privileges and rights of inmates must be the same as those of the general population. The various purposes for housing an inmate in administrative segregation are described in K.A.R. 44–14–302, as noted in subpart A of the long-term plan. Consideration must be given for the reason the inmate was placed in administrative segregation when defendants decide what privileges and property the inmate should retain. But, the plan does not mandate individualized consideration of inmates who have been placed in administrative segregation for the same reason.

Nevertheless, the number of inmates on administrative segregation does raise a concern that, contrary to state regulations, administrative segregation is being used for punishment. The court is also concerned that defendants may not be taking full advantage of the procedures for reviewing the long-term housing of inmates in administrative segregation. Accordingly, the court urges defendants to review the explanation and justification for placing inmates in administrative segregation as "other security risks" or "pending investigation." If the explanation and justification lacks necessary substance or credibility for any reason, including the passage of time, then the inmate should be removed from administrative segregation. Defendants should seek to limit the potential for expensive and time-consuming litigation regarding administrative segregation by taking steps to assure that the letter and spirit of state regulations are being followed.

In conclusion, the court finds that the long-term plan for administrative segregation requires consideration of the purpose or reason for placing inmates in administrative segregation when deciding what privileges and

---

3. In the case of "other security risks," administrative segregation may be ordered "if such inmate or inmates are engaging in behavior which threatens the maintenance of security or control of the correctional facility." K.A.R. 44–14–302(g). A written explanation and justification for such action must be made by the "principal administrator" when administrative segregation is ordered for "other security risks." A similar report is required when an inmate is placed in administrative segregation for other reasons. K.A.R. 44–14–304.

rights are available to those inmates. The various purposes or reasons for placing an inmate in administrative segregation are listed in K.A.R. 44–14–302. Where possible, defendants must allow inmates privileges and property commensurate with the purposes and reasons for placing inmates in administrative segregation. To the extent possible, defendants also must allow administrative segregation inmates the same privileges and rights as inmates in general population. However, the long-term plan does not require defendants to accord privileges and rights to inmates placed in administrative segregation for the same reason (e.g., "other security risk" or "pending investigation") on an individualized basis. The plan does not require, for example, that inmate A placed in administrative segregation pending investigation be granted X amount more out-of-cell time because he is considered to have less potential for violence than inmate B who was also placed in administrative segregation pending investigation.

Because of this ruling and defendants' notice of compliance with the long-term plan for mentally ill inmates (Doc. No. 498), the court believes a status conference would be helpful. The court's scheduling clerk will be in contact with counsel to schedule a status conference in the near future.

**IT IS SO ORDERED.**